IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>TIMOTHY W. BUNN,<br><br>         Debtor(s). | CASE NO. BK22-40994-TLS<br><br>CHAPTER 7<br><br>ADV. NO. A23-4004-TLS |
| NISSAN MOTOR ACCEPTANCE COMPANY LLC, f/k/a NISSAN MOTOR ACCEPTANCE CORPORATION,<br><br>         Plaintiff(s)<br> vs.<br><br>TIMOTHY W. BUNN and MOXIE AUTO SALES, LLC d/b/a MOXIE MITSUBISHI,<br><br>         Defendants(s). | **ORDER** |

  This matter is before the court on the plaintiff's complaint for determination of dischargeability under 11 U.S.C. §§ 523(a)(2)(A), (4), and (6). Trial was held on June 4, 2024. Sheila Bentzen appeared for plaintiff Nissan Motor Acceptance Company LLC, f/k/a Nissan Motor Acceptance Corporation. Trev Peterson appeared for the defendants Timothy W. Bunn and Moxie Auto Sales, LLC, d/b/a Moxie Mitsubishi. The parties filed post-trial closing briefs and the matter is now ready for decision.

  The debtor operated a car dealership in Lincoln, Nebraska, and obtained floor plan inventory financing from Nissan Motor Acceptance Corporation ("NMAC"). NMAC alleges the debtor and his dealership sold vehicles in breach of the financing agreement and failed to pay NMAC, and as a result owe NMAC more than $525,000 in principal and interest. NMAC contends the debtor made fraudulent misrepresentations and both defendants engaged in fraudulent actions that should except the debt from discharge.

  For the reasons stated in this Order, judgment will be entered in favor of the plaintiff and against the defendants, although the amount of non-dischargeable debt owed by the debtor is less than the plaintiff seeks, as explained below.

Findings of Fact

  Moxie Auto Sales, LLC, d/b/a Moxie Mitsubishi ("MAS"), was an automobile dealership in Lincoln, Nebraska. It opened in 2016. Moxie Dealer Services, Inc. ("DS"), owned 67% of MAS. Christopher Investments, LLC, owned 33% of the interest in MAS and was not involved in operating the business. The debtor, Timothy Bunn, owned 100% of DS. He was the managing

member of MAS and oversaw the dealership's day-to-day operations. Bunn testified that he has been involved in the automobile industry since 1986, in sales, finance, and owning and operating dealerships.

In 2019, NMAC agreed to finance MAS's acquisition of new and used vehicles for the dealership's inventory in what is known as floor plan financing, and entered into an Automotive Wholesale Financing and Security Agreement with MAS. In consideration for NMAC's agreement to provide funds, MAS gave NMAC a security interest in all of its assets other than real property. NMAC timely perfected its security interest by filing a UCC-1 financing statement with the Nebraska Secretary of State. DS, Bunn, and the owners of Christopher Investments each signed a personal guaranty of the debt to NMAC.

By the middle of 2021, MAS was experiencing financial difficulties. NMAC audited MAS's wholesale inventory three times between mid-July and mid-September 2021 and determined that MAS had breached the financing agreement by selling vehicles out of trust, that is, by failing to pay NMAC from the proceeds of vehicles MAS sold or leased, which MAS and Bunn admit to. Bunn testified MAS was unable to pay NMAC back for some of the vehicles sold because MAS had not received payment for them. During this time period, Bunn was also seeking non-floor-plan funding to keep the business going from sources such as merchant cash advance services.

NMAC followed up the audit findings with a written notice dated October 12, 2021, advising MAS that it was in default under the financing agreement and the loan would be terminated as of January 14, 2022, and must be paid in full by that date. Upon receiving this notice, Bunn began searching for other financing options and initiated arrangements to transition MAS's floor plan financing to a lender called NextGear. That deal apparently fell through when NMAC refused to authorize the proposed transfer. Bunn testified that it was never his intention to double floor plan the vehicles, but rather to have NextGear buy out NMAC's interest in the floor planned vehicles. Nevertheless, records show that both NMAC and NextGear claimed security interests in some of the same vehicles as collateral for MAS's floor plan financing. After the notice of default but before the loan termination date, NMAC continued to advance floor plan funding to MAS. MAS also continued to sell vehicles out of trust.

In January 2022, NMAC took further steps to protect itself after discovering additional events of default under its financing arrangement. First, it demanded payment from MAS for the vehicles sold out of trust by letter dated January 5, 2022. Then, when payment was not made, NMAC filed a state court lawsuit against MAS and the individuals who had personally guaranteed the loan, including Bunn. On January 27, 2022, the state court granted NMAC a temporary order of replevin ordering MAS and Bunn to hold in their possession, unimpaired and unencumbered, all of NMAC's collateral.

Despite receiving the temporary order, MAS continued to sell vehicles that were included in NMAC's collateral but did not remit the proceeds to NMAC. In early March 2022, the state court found the defendants to be in contempt because they had willfully violated the temporary replevin order by continuing to sell and otherwise dispose of vehicles in violation of that order. The state court sentenced Bunn to 30 days in jail but suspended the sentence and offered the

defendants the option of purging the contempt by paying $311,125.00 to NMAC within 10 days. It is not clear from the order how the state court calculated that amount, but according to NMAC, that sum represented the approximate amount due just for the vehicles sold in violation of the temporary order. To purge themselves of the contempt, MAS and Bunn timely surrendered a vehicle and paid the balance due under the contempt order. The state court also authorized NMAC to remove its vehicle collateral from MAS's lot, and MAS ceased operations a few weeks thereafter in April 2022.

In November 2022, Bunn filed the underlying Chapter 7 bankruptcy petition, listing the MAS entities as business names he had used. In February 2023, NMAC filed this adversary proceeding alleging fraud, embezzlement, and willful and malicious injury by the debtor.

Applicable Law and Discussion

1. Is the debtor liable for the LLC's actions?

Generally, courts may employ a two-step analysis to determine whether a complaint objecting to dischargeability is proper. "[F]irst, the courts determine the validity of the debt under applicable law; and second, the courts determine whether the debt should be excepted from discharge under section 523. This analysis appears most appropriate where the underlying debt is disputed[.]" *Takuski v. Kurtz (In re Kurtz)*, 604 B.R. 549, 556 (Bankr. D. Neb. 2019) (citations omitted).

Because the parties here dispute whether the debtor is liable for the debt owed by MAS to NMAC, that two-step analysis theoretically is applicable in this case. However, in practice, the second step of the analysis is subsumed by the initial inquiry into Bunn's liability because the elements are the same under Nebraska law and bankruptcy law.

NMAC argues, first, that the bankruptcy court should hold Bunn personally liable for MAS's debt either by piercing MAS's corporate veil or by finding that he participated in the conversion of NMAC's collateral.

While MAS is a limited liability company and not a corporation, its "corporate veil" nevertheless can be pierced to prevent fraud or injustice. *E & A Consulting Grp., Inc. v. World Baseball Vill. Mgmt., LLC*, No. A-12-844, 2013 WL 4437312, at *4 (Neb. Ct. App. Aug. 20, 2013). Whether and how to pierce the corporate veil is a matter of state law. *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003). A creditor seeking to pierce the corporate veil bears the burden of showing by a preponderance of evidence that the corporate entity must be disregarded to prevent fraud or injustice to the creditor. *J.L. Brock Builders, Inc. v. Dahlbeck*, 391 N.W.2d 110, 115 (Neb. 1986).

In addition,

> Under Nebraska law, "individual members and managers of a limited liability company are generally not liable for a debt, obligation, or liability of the company." *Thomas & Thomas Ct. Reps., L.L.C. v. Switzer*, 283 Neb. 19, 810 N.W.2d 677, 685

> (2012). **But "where a tort action is brought against an officer or director, there is no need to pierce the corporate veil and liability will be imposed if the elements of the tort are satisfied."** *Huffman v. Poore*, 6 Neb. App. 43, 569 N.W.2d 549, 557 (1997); *Wolf v. Walt*, 247 Neb. 858, 530 N.W.2d 890, 893, 896-98 (1995) (refusing to pierce the corporate veil and then analyzing whether the president and shareholder of a corporation was liable for "constructive fraud committed by the corporation").

*Lund-Ross Constructors, Inc. v. Buchanan (In re Buchanan)*, 31 F.4th 1091, 1095 (8th Cir. 2022) (emphasis added).

"[O]fficers and directors of a corporation may be held individually liable for personal participation in tortious acts even though they derived no personal benefit, but acted on behalf of, and in the name of, the corporation and the corporation alone was enriched by the acts." *Huffman v. Poore*, 569 N.W.2d 549, 559 (Neb. Ct. App. 1997).

In the present case, NMAC has alleged a cause of action against Bunn for fraudulent misrepresentation under Nebraska law. NMAC argues that Bunn is personally liable because he participated in MAS's conversion of NMAC's collateral. As stated in the *Buchanan* case, it is unnecessary to pierce the corporate veil if the elements of the tort of fraudulent misrepresentation are proven.

2. Fraudulent misrepresentation under Nebraska law and false representations under 11 U.S.C. § 523(a)(2)(A)

To sustain a claim for fraudulent misrepresentation, the plaintiff must show by a preponderance of the evidence (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that the representation was made with the intention that the plaintiff should rely on it; (5) that the plaintiff reasonably did so rely on it; and (6) that the plaintiff suffered damage as a result. *Zawaideh v. Nebraska Dep't of Health & Hum. Servs. Regul. & Licensure*, 825 N.W.2d 204, 212 (Neb. 2013); *Huffman v. Poore*, 569 N.W.2d 549, 558 (Neb. Ct. App. 1997).

These elements of fraudulent misrepresentation under Nebraska law are essentially the same as the elements of false representation under § 523(a)(2)(A) of the Bankruptcy Code, which excepts from discharge a debt for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud." For the creditor to prevail under this exception, it must carry its burden of proving by a preponderance of the evidence that a debtor (1) made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, and which (5) proximately caused the creditor damage. *Hernandez v. Gen. Mills Fed. Credit Union (In re Hernandez)*, 860 F.3d 591, 602 (8th Cir. 2017) (citations omitted). The only significant difference between the two is that the Bankruptcy Code requires proof of the debtor's intent to deceive.

NMAC asserts that Bunn's failure to disclose to NMAC that (1) some of MAS's inventory was also used as collateral for another lender and (2) some of the vehicles MAS claimed as inventory had been sold and were no longer on the lot are false representations or false pretenses under §523(a)(2)(A). "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." *Merchants Nat'l Bank v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (quoting *In re Malcolm*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). False representations may be by omission or commission. *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987), *abrogated on other grounds*, *Grogan v. Garner*, 498 U.S. 279 (1991). A "misrepresentation" is "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." *Moen* at 791 (citation omitted). A debtor's silence regarding a material fact may constitute a false representation actionable under § 523(a)(2)(A). *Moen* at 791.

Pledging one creditor's collateral to another lender without permission is undoubtedly a material fact. Bunn's decision to go ahead with the NextGear[1] floor planning despite NMAC's failure to authorize the arrangement, thereby deliberately leaving NMAC with a false impression as to its security position and causing it to continue advancing funds under the floor plan agreement while refraining from taking additional steps to protect its interests, was a false representation under §523(a)(2)(A) and a fraudulent misrepresentation under Nebraska law. NMAC reasonably and justifiably relied on what Bunn represented to it, and suffered a financial loss as a result.

Likewise, selling vehicles out of trust while allowing NMAC to continue to believe the collateral was part of MAS's inventory is a false representation and fraudulent misrepresentation. Bunn testified that he was not aware of the out-of-trust sales at the time; the dealership had 25 employees and Bunn did not oversee every sale or every receipt. Instead, he relied on employees who knew and were expected to follow the proper procedures for posting and depositing receipts and making the appropriate payments to floor plan lenders. Bunn also testified, however, that he was in charge of MAS's day-to-day operations, and he received regular reports showing the status of MAS's floor plan financing with NMAC. As a result, he should have been aware of the fact that payments to NMAC were not being made in accordance with the financing agreement.

3. Willful and malicious injury under 11 U.S.C. § 523(a)(6)

NMAC alleges the defendants intentionally converted NMAC's collateral by selling floor planned vehicles out of trust, which caused financial harm to NMAC. NMAC further alleges the defendants' conduct in doing so was willful and malicious and should be excepted from discharge under §523(a)(6).

A debt may be excepted from the discharge of debts granted under 11 U.S.C. § 727 if it is "for willful and malicious injury by the debtor to another entity or to the property of another

---

[1] Documents admitted into evidence show that certain vehicles were floor planned with lenders other than NMAC or NextGear. Bunn testified that he did not have financing agreements with those other lenders, and they appear on the document because they were the floor plan lenders for the sellers from whom MAS purchased the vehicles.

- 5 -

entity." 11 U.S.C. § 523(a)(6). Congress did not specify the unlawful conversion of the property of another as non-dischargeable under §523(a) because "willful and malicious injury" covers a "willful and malicious conversion." 124 *Cong. Rec.* H11,095–11,096 (daily ed. Sept. 28, 1978); S17, 412–13 (daily ed. Oct. 6, 1978).

A non-dischargeability action under § 523(a)(6) has three elements: (1) the debtor caused an injury to the creditor; (2) the injury must have been willfully inflicted – that is, the debtor must have desired the injury or must have been substantially certain that his conduct would result in the injury; and (3) the debtor's actions must have been malicious. *Luebbert v. Global Control Sys., Inc. (In re Luebbert)*, 987 F.3d 771, 778 (8th Cir. 2021). The party seeking to prevent discharge bears the burden of showing each element by a preponderance of the evidence. *Blocker v. Patch (In re Patch)*, 526 F.3d 1176, 1180 (8th Cir. 2008).

The Eighth Circuit Court of Appeals long ago set out the test to be applied to sales out of trust: "When transfers in breach of security agreements are in issue, we believe nondischargeability turns on whether the conduct is (1) headstrong and knowing ('willful') and, (2) targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm." *Barclays Am./Bus. Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 881 (8th Cir. 1985).

In the *Long* case, the debtor was the president and majority stockholder of the borrower, and guaranteed the company's loans. As the company was struggling financially, Long diverted accounts receivable proceeds (Barclays' collateral) to a new corporate account and used those proceeds to try to keep the company going. When that effort failed, Barclays sought to except the debt from discharge under various provisions of the Bankruptcy Code, including §523(a)(6).

There was no dispute over whether Long's conversion of the proceeds was willful. "With full knowledge of the secured status of [Barclays] and [the company's] contractual duty to segregate funds, Long intentionally and deliberately caused to be opened an account to which funds rightfully belonging to [Barclays] were funneled." *Barclays Am./Bus. Credit, Inc. v. Long (In re Long)*, 44 B.R. 300, 306 (Bankr. D. Minn. 1983), *aff'd*, 774 F.2d 875 (8th Cir. 1985).

Bunn's actions here echo those of the debtor in the *Long* case. Bunn was fully cognizant of the requirements of the financing arrangement with NMAC and the terms of the floor plan financing agreement. He testified that he knew it was a contractual violation to sell the floor planned vehicles without repaying NMAC. Bunn further testified that he did not intentionally double floor plan NMAC's vehicles, but he conceded that an overlap of security interests was possible under the circumstances. This conduct establishes the willfulness of the injury to NMAC. *See Sells v. Porter (In re Porter)*, 539 F.3d 889, 894 (8th Cir. 2008) (willful injury is one which involves a "deliberate or intentional invasion of the legal rights of another").

The issue then becomes whether Bunn acted with malice.

> The debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent some additional aggravated circumstances. Conduct which is certain or almost certain to cause financial harm to the creditor is

>required. While intentional harm may be difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent.

*Johnson v. Logue (In re Logue)*, 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003) (citing *Long*, 774 F.2d at 881).

Bunn argues that his actions in double floor planning NMAC's collateral and selling vehicles out of trust were not malicious. He cites the recent decision from this court of *Rist v. Rist (In re Rist)*, Adv. No. A23-4006-TLS, 2024 WL 1099718 (Mar. 13, 2024), for the proposition that a debtor's intentional use of the proceeds of the sale of collateral belonging to another in order to save the debtor's own business is not malicious. Bunn argues that by putting the vehicle proceeds back into the business instead of paying them to NMAC, he was simply trying to save MAS. Unfortunately, it is not at all clear that Bunn put the proceeds back into the business. Instead, he commingled funds from his various businesses and used his business bank accounts as his personal bank accounts. Bunn uses some creative math to assert the lack of personal gain from his transgressions, but the extreme and inexplicable level of commingling makes that argument dubious.

*Rist* quoted precedential case law from Eighth Circuit appellate courts stating just what Bunn argues: "[C]onversion alone is not enough to prevent a debt from being discharged," *id.* at 7-8, and "Where a debtor has used the proceeds in an attempt, albeit unsuccessful one, to keep a business afloat, malice may not necessarily be inferred from the debtor's conduct." *Id.* at 8. However, the case law also states that "additional aggravated circumstances" in the debtor's actions will support a finding of malice. *See id.* at 6-7.

If the court were to adopt Bunn's reasoning regarding economic harm, then it would be difficult to conceive of a level of conduct that *would* be malicious. Any debtor who converted money or property could rely on the argument that he was, in good faith, merely trying to save his business.[2] In this case, Bunn acted with a heightened degree of culpability, doing more than simply breaching a security agreement. Instead, he deliberately and repeatedly breached it. Even after NMAC notified him that MAS was in default and the loan would be terminated, Bunn as MAS's manager continued to sell vehicles out of trust. Even after NMAC filed its state court lawsuit and obtained a temporary order of replevin, Bunn allowed MAS to continue to sell NMAC's collateral without remitting the proceeds to NMAC. Bunn persisted in his conduct, knowingly causing financial harm to NMAC, right up until he was found to be in contempt of the replevin order and ordered to jail, which he avoided by making a payment to NMAC for a portion of its damages. The ongoing harm to NMAC didn't stop until NMAC was able to repossess the collateral in MAS's possession, at which point the sales out of trust ended, but NMAC continues to be owed money for payments it did not receive.

---

[2] This thought was more eloquently stated in *Universal Pontiac-Buick-GMC Truck, Inc. v. Routson (In re Routson)*, 160 B.R. 595, 607 (Bankr. D. Minn. 1993): "To hold that debts resulting from conversion under such circumstances are dischargeable, is to provide financially distressed debtors a powerful self-help remedy that is without legal or equitable precedent."

Bunn's actions were unarguably willful, and they were also malicious. Bunn, with nearly 40 years of experience in the automotive sales industry, knew his actions – both his failure to pay NMAC for vehicles sold and his pledge of NMAC's collateral to other lenders – would cause it economic injury. He knowingly, intentionally and wrongfully destroyed NMAC's financial interests in the property he converted. *See Universal Pontiac-Buick-GMC Truck, Inc. v. Routson (In re Routson)*, 160 B.R. 595, 607-08 (Bankr. D. Minn. 1993). And he continued to do so even after being declared in default, sued, and ordered by a state court to hold on to the collateral. Accordingly, the debt is non-dischargeable under §523(a)(6).

4. Embezzlement under 11 U.S.C. § 523(a)(4)[3]

The Bankruptcy Code excepts from discharge under § 727 any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" § 523(a)(4). Embezzlement is the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come. *Belfry v. Cardozo (In re Belfry)*, 862 F.2d 661, 662 (8th Cir. 1988). The plaintiff must establish that the debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used. *Id.* In other words, the creditor must establish "the debtor improperly used the creditor's property before complying with some obligation to the creditor." *Werner v. Hofmann*, 5 F.3d 1170, 1172 (8th Cir. 1993) (citation omitted). To show embezzlement, the creditor has to prove that it entrusted its property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud. *Bank of Am., N.A. v. Armstrong (In re Armstrong)*, 498 B.R. 229, 234 (B.A.P. 8th Cir. 2013) (citation omitted).

NMAC alleges the debtor committed embezzlement by selling vehicles out of trust and using the sale proceeds in breach of the financing agreement. A number of courts hold that a debtor commits an embezzlement under § 523(a)(4) when the debtor sells mortgaged property and fails to remit the proceeds to a properly perfected, secured creditor. *See Jones v. Hall (In re Hall)*, 295 B.R. 877, 882 (Bankr. W.D. Ark. 2003) (collecting cases).

Here, the debtor admits selling NMAC's collateral and not paying the proceeds to NMAC. He also admits that MAS did not deposit the proceeds from floor planned vehicles into a separate account to be held in trust for NMAC, as required by the financing agreement. Instead, the proceeds were simply deposited into MAS's regular bank account. The cash in the bank accounts for DS and MAS was used by both entities – and Bunn – as needed. Bunn testified that sometimes DS paid for MAS's expenses, sometimes MAS deposited cash down payments for vehicles in DS's account, sometimes DS took out loans for MAS. There were no promissory notes between DS and MAS, although Bunn testified that they tried to keep the accounts as separate as possible.

Bunn testified that proceeds received from the sale of floor planned vehicles should be transferred to the lender within five to seven days after the sale. He admitted that he knew the proceeds belong to the floor plan lender, not to the dealership. He testified that the funds received from vehicles sold out of trust were not transferred to NMAC as they should have been and instead

---

[3] The plaintiff included in its complaint allegations under § 523(a)(4) of defalcation while acting in a fiduciary capacity, but has not pursued that issue.

were used to keep MAS afloat by paying taxes, payroll, utilities, employee benefits, and certain accounts payable. This improper use of NMAC's funds meets each element of the definition of embezzlement. Accordingly, the debt should be excepted from discharge under §523(a)(4).

5. Amount of the debt

NMAC seeks a total of $525,245.32 in damages. This sum represents a principal balance due under the floor plan financing of $420,114.77 and interest due through the date the bankruptcy petition was filed of $105,130.55. *See* Fil. No. 57. The defendants argue, without any actual evidence, for a reduction of $148,723.90, based on NMAC's delay in selling the replevined vehicles which resulted in a reduced sale price. NMAC's witness testified that there was indeed a delay in auctioning off the replevined vehicles because NMAC had to apply for new titles for the vehicles. The witness further testified that the delay did not cause a decrease in the selling price of the vehicles, however, because demand for used vehicles at the time was strong so the price received for some of the vehicles exceeded the amount of the original floor balance. Regardless, the defendants failed to offer any evidence to show that the delay caused a decrease in the sale prices.

The debt owed by MAS, which is a non-debtor party and therefore not subject to §523(a), is simply a contract claim arising from the breach of the Automotive Wholesale Financing and Security Agreement. Other than the unsupported argument regarding the delay in selling the repossessed vehicles, MAS has not offered any defense to the contractual balance due. NMAC established that it is entitled to the full amount of its requested damages from MAS, and judgment will be entered accordingly.

It is, however, unclear why NMAC is arguing that the entire amount of the debt should be excepted from Bunn's discharge, rather than just the portion attributable to his fraudulent or willful and malicious conduct. Bunn, as guarantor, was liable for the contractual balance due from MAS, but Bunn's liability on that debt was discharged – except to the extent some or all of it arose from the §523(a) issues alleged in this adversary proceeding. Even then, NMAC has already recovered some of what it is owed by virtue of the debtor's purge payment and NMAC's repossession and sale of its remaining collateral.

The evidence before the court indicates that, of the vehicles either sold out of trust or double floor planned, NMAC has not received payment for 11 of them. Those vehicles are listed on Exhibit 52, lines 53 through 63. The outstanding balance on those vehicles totals $331,225.00. That is the amount of principal NMAC is entitled to for damages.

Because Bunn's liability on this debt was not established until now, pre-judgment interest is not appropriate. However, NMAC is entitled to post-judgment interest as allowed by law.

Conclusion

The defendants are liable for the debt owed to NMAC in the amount of $525,245.32. MAS has not filed bankruptcy nor received a discharge, so judgment will be entered against MAS in that amount. Because Bunn has received a bankruptcy discharge, judgment will be entered against

Bunn only for the portion of the debt attributable to the sale of collateral out of trust and collateral pledged to another lender, totaling $331,225.00, which amount is excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

IT IS ORDERED: For the foregoing reasons, the plaintiff's complaint is granted to the extent set forth above. Separate judgment will be entered in favor of the plaintiff.

DATED: September 9, 2024

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the court to:
  *Sheila Bentzen
  Trev Peterson
  John Stalnaker
  U.S. Trustee

*Movant is responsible for giving notice to other parties if required by rule or statute.